**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARLOS BALCACERES, | ) Case No. CV 17-8683-JPR |
| | ) |
| Plaintiff, | ) |
| | ) **MEMORANDUM DECISION AND ORDER** |
| v. | ) **AFFIRMING COMMISSIONER** |
| | ) |
| NANCY A. BERRYHILL, Acting | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**I.    PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").[1]  The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c).  The matter is before the

_____

[1] Although the ALJ did not so note in her decision, Plaintiff abandoned his DIB claim at his first hearing, on July 29, 2015 (see Administrative Record 46, 48), most likely because his date last insured was June 30, 2011 (see AR 11, 47), and there was scant medical evidence in the record from before then. Accordingly, the Court considers only Plaintiff's SSI claim.

Court on the parties' Joint Stipulation, filed July 19, 2018, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is affirmed.

**II. BACKGROUND**

Plaintiff was born in 1957. (Administrative Record ("AR") 62, 216.) He completed high school in El Salvador and did college-level maintenance training, where he was taught in both English and Spanish. (AR 29.) He apparently worked most recently as a porter for a rental-car company, but for most of his career, until 2006, he worked as a "CNC operator."[2] (AR 28-29.)

In late June 2013, Plaintiff applied for DIB (AR 216) and SSI (AR 210). In the DIB application, he alleged disability beginning March 1, 2006 (AR 216); in the SSI application, he listed his onset date as January 1, 2003 (AR 210). He subsequently amended his onset date to January 2013. (AR 46, 48.) He alleged he was unable to work because of herniated testicles, anxiety, depression, and insomnia. (AR 69.)

After Plaintiff's applications were denied initially (AR 99, 102) and on reconsideration (AR 107-12), he requested a hearing before an Administrative Law Judge (AR 114-15). A hearing was held on July 29, 2015, at which he was represented by counsel and testified with the assistance of a Spanish-language interpreter.

---

[2] A computer numerical control operator produces machined parts and tools by programming, setting up, and operating a numerical control machine. See "Numerical Control Machine Operator," DOT 609.362-010, 1991 WL 684899 (Jan. 1, 2016).

(AR 42-61.)  A vocational expert also testified.  (AR 56-61.)
After the hearing, Plaintiff was referred to a psychiatrist for a
consulting examination.  (AR 416-21.)  Plaintiff's counsel
requested a supplemental hearing (AR 278), which was held on
March 17, 2016 (see generally AR 24-41), after the psychiatric
examination.  Plaintiff was represented by counsel at the
supplemental hearing and testified through an interpreter.  (AR
48-56.)  A vocational expert also testified.  (AR 56-61.)  In a
written decision issued April 11, 2016, the ALJ found Plaintiff
not disabled.  (AR 18.)  On June 1, 2016, Plaintiff requested
review from the Appeals Council (AR 207), which on October 18,
2017, denied it (AR 1-6).  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the
Commissioner's decision to deny benefits.  The ALJ's findings and
decision should be upheld if they are free of legal error and
supported by substantial evidence based on the record as a whole.
See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v.
Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence
means such evidence as a reasonable person might accept as
adequate to support a conclusion.  Richardson, 402 U.S. at 401;
Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It
is more than a scintilla but less than a preponderance.
Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether
substantial evidence supports a finding, the reviewing court
"must review the administrative record as a whole, weighing both
the evidence that supports and the evidence that detracts from

3

the Commissioner's conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. <u>Id.</u> at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.   42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step sequential evaluation process to assess whether a claimant is disabled.   20 C.F.R. § 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).   In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.   § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied.   § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to

4

determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[3] to perform his past work; if so, he is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. <u>Drouin</u>, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. <u>Id.</u>

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257.

---

[3] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. <u>Laborin v. Berryhill</u>, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

1          B.   The ALJ's Application of the Five-Step Process

2          At step one, the ALJ found that Plaintiff had not engaged in

3     substantial gainful activity since March 1, 2006, the original

4     alleged onset date for his DIB claim.  (AR 12.)  At step two, she

5     concluded that he had severe impairments of "hernia, status-post

6     repair [and] depressive disorder."  (AR 13.)  At step three, she

7     found that those impairments did not meet or equal a Listing.

8     (Id.)  At step four, she determined that he had the RFC to

9     perform medium work but could "never have contact with the public

10    and no more than occasional contact with co-workers and

11    supervisors."  (AR 14.)  Based in part on the vocational expert's

12    testimony at the supplemental hearing (AR 36-41), the ALJ

13    concluded that he could perform his "past relevant work as a CNC

14    Operator" "as actually and generally performed."  (AR 17-18.)

15    Thus, she found him not disabled.  (AR 18.)

16    **V.   DISCUSSION**

17         Plaintiff argues that the ALJ erred by rejecting the opinion

18    of treating psychiatrist Ines Gerson and "fail[ing] to provide

19    legally sufficient reasons for [doing so]."  (J. Stip. at 8; see

20    also id. at 4-8.)  For the reasons discussed below, remand is not

21    warranted.

22         A.   Applicable Law

23         The ALJ must consider all the medical opinions "together

24    with the rest of the relevant evidence."  § 416.927(b).[4]  Three

25    _____

26         [4] Social Security regulations regarding the evaluation of
      opinion evidence were amended effective March 27, 2017.  When, as
27    here, the ALJ's decision is the final decision of the
      Commissioner, the reviewing court generally applies the law in
28    effect at the time of the ALJ's decision.  See Lowry v. Astrue,

                                    6

types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. <u>Lester</u>, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's. <u>Id.</u>; <u>see also</u> § 416.927(c). This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996); <u>see also</u> § 416.927(c)(2). But "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended) (citation omitted).

The ALJ may disregard a physician's opinion regardless of whether it is contradicted. <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989); <u>see also</u> <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008). When a doctor's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for a "clear and convincing"

_____

474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); <u>Garrett ex rel. Moore v. Barnhart</u>, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); <u>Spencer v. Colvin</u>, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking"). Accordingly, citations to 20 C.F.R. § 416.927 are to the version in effect from August 24, 2012, to March 26, 2017.

reason. <u>Magallanes</u>, 881 F.2d at 751; <u>Carmickle</u>, 533 F.3d at 1164 (citing <u>Lester</u>, 81 F.3d at 830-31). When it is contradicted, the ALJ need provide only a "specific and legitimate" reason for discounting it. <u>Carmickle</u>, 533 F.3d at 1164 (citing <u>Lester</u>, 81 F.3d at 830-31). The weight given a doctor's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. <u>See</u> § 416.927(c), (e).

Furthermore, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002) (citation omitted); <u>accord</u> <u>Batson v. Comm'r of Soc. Sec.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004); <u>see also</u> <u>McLeod v. Astrue</u>, 640 F.3d 881, 884-85 (9th Cir. 2011) (as amended) (finding that treating physician's opinion "is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability" (citation omitted)). An ALJ need not recite "magic words" to reject a physician's opinion or a portion of it; the court may draw "specific and legitimate inferences" from the ALJ's opinion. <u>Magallanes</u>, 881 F.2d at 755.

The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

B.    Relevant Background

1.    Treatment records

On March 25, 2013, Plaintiff reported feeling hopeless, "depressed or . . . down" during a follow-up visit after hernia surgery. (AR 294.) This appears to have been the first time in the record that he expressed having such symptoms. After performing psychometric depression scale tests, the examining physician declined to diagnose him with depression. (AR 295-96.) Plaintiff apparently did not report any mental-health symptoms during his next visit, on April 15, 2013. (AR 297-98.)

Plaintiff began seeking mental-health services at West Valley Mental Health Center in July 2014. (AR 365.) He reported at his initial appointment that he had felt depressed for the past 10 years, had auditory hallucinations three months prior, and had attempted suicide "[five] years ago while under the influence of [alcohol]."[5] (AR 365.) Although the amended alleged onset date for his mental-health issues was January 2013 (AR 46, 48), it seems Plaintiff did not seek or receive care for them before July 2014, as the ALJ noted. (See AR 15, 51-52.)[6]

_____

[5] During an intake interview a few days earlier, Plaintiff apparently indicated that his mental-health problems had been ongoing for the prior five years, not 10. (AR 372.)

[6] In several places, the medical notes attest to Plaintiff's finally seeking treatment in July 2014 so that he could demonstrate continuity of care for his SSI application. (See AR 368 (note from July 14, 2014: "Client is eager to begin services with the Dept. to establish continuity of care."), 383 (note from Oct. 27, 2014: "Explained to him to qualify for completing [Social Security] paperwork he has to have one year of treatment history.").) He told the nurse practitioner at his initial appointment at West Valley that he had not had prior mental-health treatment. (AR 365.)

The medical records from West Valley include a number of patient questionnaires seeking information about medical history and symptoms. (See, e.g., AR 366-67, 370, 373, 375-76, 377-79.) They show that he saw a substance-abuse counselor (see AR 391; see also AR 398) and Dr. Rhodora Tolentino (see AR 395-97, 400-02), apparently a psychiatrist, in addition to Dr. Gerson (see AR 384, 386, 392-93, 407, 424).

On July 14, 2014, Dr. Tolentino diagnosed Plaintiff with "Major Depressive Disorder, recurrent, severe with psychotic features" and alcohol dependence and noted that he had a "long history of mental illness and alcohol use; homeless, financial problem, problem with mental health services, unemployed, relational problem with wife and children; other psychosocial factors." (AR 401.) She apparently assessed a Global Assessment of Functioning score of 40.[7] (Id.) The record does not reveal

[7] A GAF score of 31 to 40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Diagnostic and Statistical Manual of Mental Disorders 34 (Am. Psychiatric Ass'n, revised 4th ed. 2000). The Commissioner has declined to endorse GAF scores, Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50764-65 (Aug. 21, 2000) (codified at 20 C.F.R. pt. 404) (GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings"), and the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders "dropped" the GAF scale, citing its "conceptual lack of clarity and "questionable psychometrics in routine practice," Am. Psychiatric Ass'n, Introduction, Diagnostic and Statistical Manual of Mental Disorders (Am. Psychiatric Ass'n, 5th ed. 2012), https://doi.org/ 10.1176/appi.books.9780890425596. Because GAF scores continue to be included in claimant medical records, however, the Social Security Administration has clarified that they are "medical opinion evidence under 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2) if they come from an acceptable medical source." Wellington v. Berryhill, 878 F.3d 867, 871 n.1 (9th Cir. 2017)

what tests, if any, she conducted to determine his diagnosis. (See generally AR 400-02.) She prescribed Wellbutrin,[8] an antidepressant, and risperidone, an antipsychotic.[9] (AR 402.)

Plaintiff began seeing Dr. Gerson on August 7, 2014. (AR 392; see also AR 410.) She diagnosed him with "Major Depressive Disorder, recurrent, severe with psychotic features" and alcohol dependence "in recent remission," and she determined his GAF score to be 40. (AR 393.) The record does not indicate what tests, if any, she conducted to make those diagnoses, and it appears she relied primarily on Plaintiff's self-reported history and symptoms and her general observations. (See generally AR 392-94.) Her notes indicate that he reported developing auditory hallucinations and paranoid delusions as a result of heavy drinking. (AR 392.) She continued his prescriptions for risperidone and Wellbutrin, though she changed the dosages slightly. (AR 393; see also AR 274.) She told him to follow up in two months. (AR 393.)

Plaintiff met with Dr. Gerson again on September 19, 2014. (AR 386.) He reported feeling better on the medications but had

(citing Richard C. Ruskell, Social Security Disability Claims Handbook § 2:15 n.40 (2017)). Here, the ALJ did not give the various GAF scores on record "much weight." (AR 17.)

[8] Wellbutrin is a name brand of buproprion, an antidepressant. Buproprion, MedlinePlus, https:// medlineplus.gov/druginfo/meds/a695033.html (last updated Feb. 15, 2018).

[9] Risperidone is in a class of medications called atypical antipsychotics; it is used to treat symptoms of schizophrenia, mania, bipolar disorder, and behavior problems. Risperidone, MedlinePlus, https://medlineplus.gov/druginfo/meds/a694015.html (last updated Nov. 15, 2017).

relapsed in his drinking about a month earlier.[10]  (_Id._)  She
noted, apparently based on his report, that he "hears voices but
less than before, worse when he drinks."  (_Id._)  His cognition
was intact and his insight, judgment, and impulse control were
adequate.  (_Id._)  She wrote that he should follow up with her in
three months.  (_Id._)  He met with her less than a month later,
however, on October 8, 2014.  (AR 384.)  The notes from that
meeting are almost word for word the same as those from the
previous meeting.  (_Compare_ id., _with_ AR 386.)  She wrote that he
should follow up in four months.  (AR 384.)  The notes from their
meeting four months later are again essentially the same as the
notes from the previous meetings.  (AR 407.)  She requested he
follow up in three months.  (_Id._)  They met once more, on July
16, 2015.  (AR 424.)  The notes from that meeting are yet again
substantively the same as the notes from the previous meetings.
(_Id._)  None of her treatment notes indicate what tests, if any,
she administered to him.  (_See_ AR 384, 386, 407, 424.)

On the Mental Impairment Questionnaire she signed on July
21, 2015 (_see_ AR 415), Dr. Gerson wrote that Plaintiff's
"response to treatment [was] good" and found that he was
"oriented x4" and "cooperative"; his "insight," "judgement," and
"impulse control" were "adequate"; and his "thought process was
linear" (AR 410).  She also noted, however, that his "mood [was]
anxious," he was "sad," and he "gets paranoid" and "hears voices"
"at times."  (_Id._)  She checked boxes indicating that he had

---

   [10] On August 28, 2014, he showed up at West Valley saying
that he needed cough medicine on an emergency basis because he
had had a beer and was throwing up.  (AR 388.)

"[h]allucinations or delusions,"[11] "[m]ood disturbance,"
"[d]ifficulty thinking or concentrating," "[p]aranoid thinking or
inappropriate suspiciousness," and "[e]motional withdrawal or
isolation." (AR 411.) She did not check boxes for "[a]nhedonia
or pervasive loss of interest in . . . activities," "[t]houghts
of suicide," "[b]lunt, flat or inappropriate affect,"
"[i]mpairment in impulse control," "[g]eneralized persistent
anxiety," "[p]ersistent disturbances of mood or affect,"
"[s]ubstance dependence," "[p]erceptual or thinking
disturbances," "[e]motional lability," "[i]llogical thinking,"
"[m]emory impairment," "[s]leep disturbance," or "[o]ddities of
thought, perception, speech or behavior." (Id.)

Plaintiff's prognosis was [g]uarded" (AR 410), and she
concluded that he was uniformly unable to meet competitive
standards for unskilled, semiskilled, or skilled work (AR 412-13)
because of "auditory hallucinations and paranoia" (AR 413). He
had "[m]arked" "[r]estriction of activities of daily living" and
"in maintaining concentration, persistence[,] or pace" and was
"[e]xtreme[ly]" limited in "maintaining social functioning." (AR
414.) She opined that he would be absent from work four or more
days a month. (AR 415.) She acknowledged, however, that
Plaintiff was able to "manage benefits" in his own "best
interests." (Id.) She did not elaborate as to how she made any
of these determinations other than to note that her assessment
that he did not have "a low IQ or reduced intellectual

_____

[11] Five days earlier, on July 16, 2015, Plaintiff had denied
having any kind of hallucinations to a nurse practitioner. (AR
423.)

13

functioning" was "based on clinical interview." (See AR 413; see also generally AR 410-15.)

## 2. State-agency consulting psychiatrists

On October 10, 2013, Dr. Edward Ritvo conducted a psychiatric evaluation of Plaintiff that was used to assess his DIB and SSI claims at the initial level. (See AR 67, 304-08.) Plaintiff told Dr. Ritvo that he had no "delusions, hallucinations, morbid mood changes, [or] any evidence of psychosis" (AR 304) and he "denie[d] recent auditory or visual hallucinations" (AR 306). His chief complaint was that he was "sad" because of his "illness," presumably his hernias. (AR 304.) He was "trying to find work now." (Id.) He denied any "excessive alcohol use" (AR 305) even though he admitted he was an alcoholic numerous times throughout the record and in his testimony (see, e.g., AR 50, 392).[12] Dr. Ritvo noted that he "[did] not appear to be responding to internal stimuli," and his thoughts were "relevant and non-delusional" and "coherent and organized." (AR 306.) Among other things, he tested Plaintiff's memory (id.), knowledge (AR 307), concentration and calculation

---

[12] Plaintiff inconsistently reported when he apparently stopped drinking alcohol. He testified in March 2016 that he stopped "12 months ago" (AR 35) and in July 2015 that he quit "December of last year" (AR 50). He told a doctor in January 2013 that he "quit [nine] months ago" (AR 333) and told another in July 2014 that he last drank three months prior (AR 366). He was apparently hospitalized for intoxication in March 2014. (AR 377.) On August 7, 2014, he told Dr. Gerson he drank three weeks prior (AR 392), and later that month he told a technician at West Valley that he "had a beer last night" (AR 388). The Court assumes Plaintiff attempted to stop several times but had relapses; it appears that he was drinking sporadically throughout the relevant period.

14

abilities (id.), and judgment (id.). The results of all these
tests were normal (AR 306-07) and Plaintiff was "of at least
average intelligence" (AR 306), so Dr. Ritvo determined that the
reported symptoms did not warrant any diagnosis and assigned a
GAF score of 70.[13] (AR 307.) Overall, he found Plaintiff "not
impaired" in any functional capacity. (AR 308.)

On September 1, 2015, more than a month after Dr. Gerson
last saw Plaintiff, consulting psychiatrist Stephan Simonian
conducted a complete psychiatric evaluation of Plaintiff. (AR
416-20.) Plaintiff told Dr. Simonian that he had "difficulty
concentrating" and had been "feeling depressed." (AR 416.) The
doctor noted, however, that he was "alert and oriented," had
coherent thought processes without "tangentiality" or "looseness
of associations," and had "no delusional thinking." (AR 418.)
Plaintiff had no "active hallucinations" but said he
"occasionally hear[d] his name being called." (Id.) Dr.
Simonian tested Plaintiff's ability to do calculations, recall
recent and remote events, and interpret proverbs. (AR 419.) As
a result of those tests, his general observations, and his review
of Plaintiff's written functional report (see AR 416), Dr.
Simonian judged Plaintiff's intellectual functioning, calculation
ability, memory, comprehension, concentration, and abstract
thinking to be average (AR 419). He diagnosed him with
depressive disorder and alcohol abuse and noted that Plaintiff

_____

[13] A GAF score of 61 to 70 indicates "some mild symptoms
. . . or some difficulty in social, occupational, or school
functioning . . . but generally functioning pretty well."
Diagnostic and Statistical Manual of Mental Disorders 34 (Am.
Psychiatric Ass'n, revised 4th ed. 2000).

15

had moderate psychological stressors. (Id.) He determined his GAF score to be 62 (id.) and found that his ability to perform work functions was "not limited" except in "relat[ing] and interact[ing] with supervisors, co-workers, and the public," as to which he was mildly limited (AR 420).

### 3. State-agency reviewing physicians

Plaintiff's medical records were reviewed and evaluated by psychologist Christal Janssen in October 2013 and Dr. Ramona Bates in September 2013.[14] (AR 65-66, 68-76.) They reviewed Dr. Ritvo's notes (AR 63, 70) as well as notes from a family clinic, presumably regarding Plaintiff's hernias (AR 64, 71). Dr. Janssen determined that the primary issue was the hernias and that affective disorders were secondary. (AR 66, 72.) She categorized both of those issues as "non severe" for the DIB claim (AR 66) but the hernias as "severe" for the SSI claim (AR 72). For the SSI claim, Dr. Bates determined that Plaintiff's impairments could "reasonably be expected to produce [symptoms]" but that his "statements about the intensity, persistence, and functionally limiting effects of the symptoms [were not] substantiated by the objective medical evidence alone." (AR 73.) She gave great weight to Dr. Ritvo's medical opinion and found Plaintiff only "[p]artially credible," noting that his statements

---

[14] Dr. Janssen's electronic signature includes a medical-specialty code of 38, indicating a psychology practice. (See AR 66); Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 15, 2015), https:// secure.ssa.gov/apps10/poms.nsf/lnx/0424501004. Dr. Bates's electronic signature includes a medical-speciality code of 35, indicating a plastic-surgery practice. (See AR 76); POMS DI 24501.004.

were "not consistent with the preponderance of evidence in the file." (AR 73-74.) She determined that his RFC was medium and that he could "[o]ccasionally . . . lift and/or carry . . . 50 pounds," "[f]requently . . . lift and/or carry . . . 25 pounds," "stand and/or walk . . . [a]bout 6 hours in an 8-hour workday," "[s]it . . . [a]bout 6 hours in an 8-hour workday," and "push and/or pull . . . [u]nlimited [weights]." (AR 74-75.) She found no other limitations. (AR 74.) Plaintiff was determined to be not disabled. (AR 67, 76.)

At the reconsideration level, the state-agency medical consultants relied on Dr. Ritvo's medical opinion (AR 80, 88) as well as some subsequent information: Plaintiff apparently stated in December 2013 that his condition had not worsened and that he had "no new physical or mental limitations or illnesses" (AR 82, 90). Also, two physicians conducted reviews on January 27, 2014, "Dr. Limos" and "Dr. Salib." (Id.)[15] Their notes indicate that "physical evidence remain[ed] insufficient," Plaintiff "retain[ed] ability to perform physical-Medium RFC/Work," and "mental condition remain[ed] [n]on-[s]evere." (Id.) On February 6, 2014, a physician named "Dr. A. Ahmed" reassessed Plaintiff's RFC and made the same determinations as Dr. Bates had at the initial level of review. (AR 84-85, 92-93; see also AR 74.)[16]

---

[15] On these pages, the record lists the date as January 27, 2013, but based on the context, it is clear the assessments were made on January 27, 2014. (See also AR 86, 94 (showing Dr. Salib's signature dated Jan. 27, 2014).) The record does not show either doctor's medical specialty.

[16] The record does not indicate Dr. Ahmed's medical specialty.

17

Again, Plaintiff was found "not disabled." (AR 85, 93.)

C. <u>Analysis</u>

The ALJ did not reject Dr. Gerson's opinion, as Plaintiff contends. (<u>See</u> J. Stip. at 4, 6, 8.) She merely gave "less weight" to it than other doctors' opinions. (AR 17.) In fact, the ALJ apparently adopted to some degree Dr. Gerson's concerns regarding Plaintiff's ability to get along with others (<u>see</u> AR 414) by limiting him to "never hav[ing] contact with the public and no more than occasional contact with co-workers and supervisors" (AR 14). Because numerous doctors assessed less restrictive limitations than Dr. Gerson, the ALJ was required to provide only a specific and legitimate reason for giving her opinion less weight. <u>See Carmickle</u>, 533 F.3d at 1164. She in fact provided two.

        1. <u>Inconsistency between opinion and treatment notes</u>

The ALJ gave less weight to Dr. Gerson's opinion in part because it had "little in the way of clinical findings to support its conclusion" and "fail[ed] to relate her opinion to either objective findings or specific clinical observations." (AR 17.) "In fact," the ALJ continued, "[the] doctor's own comments in the chart notes are not consistent with the medical source statement supplied." (<u>Id.</u>)

Inconsistency with the medical evidence, including a doctor's own treatment notes, is a specific and legitimate reason to discount a treating physician's opinion. <u>See Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008); <u>Connett v. Barnhart</u>, 340 F.3d 871, 875 (9th Cir. 2003) (physician's opinion properly rejected when his own treatment notes "provide[d] no basis for

18

functional restrictions he opined should be imposed on [plaintiff]"); <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly rejected physician's opinion when it was "implausible" and "not supported by any findings by any doctor," including herself).

Here, Dr. Gerson opined that Plaintiff could not meet competitive standards "due to auditory hallucinations and paranoia impairing his ability to concentrate, focus, or follow directions that are basic" (AR 412), but in the same opinion, she wrote that he was "oriented x4," his "insight [was] intact [and] judgement and impulse control [were] adequate," and his "thought process [was] linear" (AR 410). Her treatment notes also repeatedly show that he responded well to medications and had "intact" cognition and "adequate" "[i]nsight, judgment and impulse control." (<u>See, e.g.</u>, AR 384, 386, 407, 424.) And Dr. Gerson noted numerous times that any hallucinations Plaintiff might have had were exacerbated by his drinking (<u>see, e.g.</u>, AR 386, 407) but somewhat contradictorily acknowledged in her opinion that his drinking was in remission (<u>see</u> AR 411, 415).[17]

---

[17] Of course, if Plaintiff had still been drinking and his hallucinations were even in part caused by that drinking, as Dr. Gerson found, he would bear the burden of proving that his alcoholism was not a contributing factor material to any disability determination. <u>See</u> 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."); <u>see also</u> 20 C.F.R. § 416.935(a) (same); § 416.935(b)(1) ("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.").

Furthermore, as the ALJ noted, it is not clear that Dr. Gerson ever performed any clinical tests to determine her diagnosis. She diagnosed Plaintiff during her first meeting with him, in August 2014, but made no note of any clinical test results to support her diagnosis. (AR 392-93.) The GAF score of 40 she assigned Plaintiff at that first meeting (AR 393) was "only [a] snapshot[] of . . . behavior" at one time, as the ALJ noted (AR 17). Indeed, the score was assessed only a few weeks after Plaintiff began regularly taking mental-health medications, which Dr. Gerson recorded numerous times as working well. (See, e.g., AR 407, 410.) She apparently did not reassess his GAF or conduct any other clinical tests, subjective or objective, after their initial meeting. (See generally AR 384, 386, 407, 424 (notes from follow-up appointments showing no evidence of clinical tests).)

The doctors who did conduct testing of Plaintiff's mental status all concluded that he had far fewer limitations than Dr. Gerson assessed. Dr. Simonian conducted a series of tests to evaluate Plaintiff's condition, the most recent such evaluation in the record. (See generally AR 416-20.) The results showed that Plaintiff had average functioning and only one mild work limitation, as to interacting with others. (AR 418-20.) He had no "active hallucinations" but "occasionally hear[d] his name being called." (AR 418.) The ALJ gave "some weight" to Dr. Simonian's opinion, noting that "[t]his assessment [was] generally consistent with the record as a whole" but "the doctor examined [Plaintiff] on a single occasion." (AR 17.) Dr. Ritvo conducted similar tests, but the ALJ gave "little weight" — less

than the "less weight" she gave to Dr. Gerson's opinion — to his opinion that Plaintiff had no functional limitations (AR 307-08) because he "did not review evidence received at the hearing level, which show[ed] [Plaintiff] [was] more limited" (AR 17).[18]

Plaintiff argues that Dr. Simonian's examining opinion cannot be considered substantial evidence in support of the ALJ's findings, citing Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007), because "it is not based on a different diagnosis supported by substantial evidence or findings on an objective medical test not considered by the treating physician." (J. Stip. at 19-20.) Independent clinical findings are substantial evidence, and they can be either "(1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence or 2) findings based on objective medical tests that the treating physician has not herself considered." Orn, 495 F.3d at 632 (citations omitted). Though Drs. Simonian and Gerson both diagnosed Plaintiff with a form of depressive disorder (compare AR 419, with AR 410), Dr. Simonian found "Depressive Disorder [Not Otherwise Specified]" (AR 419) and Dr. Gerson diagnosed him with "Major Depressive Disorder recurrent, severe with [p]sychotic features" (AR 410). Those are not the same diagnoses.[19] Furthermore, Dr. Simonian's medical notes

---

[18] Around the same time as Dr. Ritvo's examination, another doctor declined to diagnose depression after psychometric testing even though Plaintiff complained of "feelings of hopelessness," depression, and "feeling down." (See AR 294-96.)

[19] Depressive disorder NOS includes "disorders with depressive features that do not meet the criteria for Major Depressive Disorder." See Depressive Disorders DSM-IV Criteria, Medicine Home Portal, https://www.medicalhomeportal.org/issue/

include numerous references to specific tests and evaluations performed (AR 418-19); Dr. Gerson's medical notes and opinion lack any reference to testing, much less to the same "objective medical tests" that Dr. Simonian performed (see AR 392, 384, 386, 407, 423, 410-15).  Thus, Dr. Simonian's opinion constituted substantial evidence on its own and Orn is not to the contrary. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (ALJ properly rejected treating physician's opinion in part because examining physician's contrary opinion "constitute[d] substantial evidence" for so finding, as "it rest[ed] on his own independent examination," and because treating-source opinion was unsupported by either "treatment notes" or "objective evidence").

Plaintiff notes that Dr. Gerson in fact identified the "clinical findings and the results of the mental status examination" supporting her opinion in her Mental Impairment Questionnaire.  (J. Stip. at 7 (citing AR 410).)  But she never explained how she arrived at those "clinical findings" other than to note that her assessment that Plaintiff did not have a low IQ was based on a "clinical interview."  (AR 413.)  The clinical findings Dr. Gerson listed in her opinion are the same as the treatment notes she recorded at prior appointments with Plaintiff.  (See, e.g., id.)  She didn't note any clinical tests to support her assessments at those meetings (see, e.g., AR 407)

<hr>

depressive-disorders-dsm-iv-criteria (last visited Oct. 10, 2018).  "Major Depressive Disorder, Recurrent," should be diagnosed only if two or more major depressive episodes occur at least two months apart that cannot be accounted for by specific situations like bereavement, drugs, or general medical conditions.  See id.  "Severe with psychotic features" is a clinical judgment made by a psychiatrist.  See id.

and she similarly failed to do so in the Mental Impairment Questionnaire (AR 410).[20]  See Connett, 340 F.3d at 875 (physician's opinion properly rejected when he failed to provide "basis for functional restrictions he opined should be imposed on [plaintiff]").  Moreover, most of her "clinical findings" were benign — Plaintiff was "oriented x4" and "cooperative" and had "intact" "insight" and "judgement"; "adequate" "impulse control"; and "linear" "thought process" — and did not support the extreme limitations she assessed.  (See, e.g., AR 410.)

Finally, Plaintiff did not have an extensive treatment history with Dr. Gerson.  Although the doctor stated on the Mental Impairment Questionnaire that they had had appointments every three months (AR 410; see also AR 51 (Plaintiff testifying in July 2015 that he used to see Dr. Gerson every two months but was then seeing her every four months)), she actually met with him just five times: monthly from August through October 2014 (see AR 392, 386, 384) and again in February (AR 407) and July 2015 (AR 424).  Plaintiff attempted to meet with her on October 27, 2014, to get her to fill out Social Security paperwork, but

---

[20] Plaintiff's reliance on Buck v. Berryhill, 869 F.3d 1040, 1049 (9th Cir. 2017) (J. Stip. at 7), is misplaced.  As an initial matter, unlike in Buck, the ALJ here did not discount Dr. Gerson's opinion because it was based on Plaintiff's self-reports.  It is true that Buck warns against comparing reports of psychiatrists to reports of other kinds of doctors given the "relative imprecision of the psychiatric methodology."  Id. (citation omitted).  But the ALJ here compared Dr. Gerson's notes and opinion (see generally AR 392, 386, 384, 407, 424, 410-15) to the notes of other psychiatrists in the record and noted the contrast that Dr. Gerson apparently did not conduct routine clinical tests (see, e.g., AR 304-09, 416-21; see also AR 17).  Buck in no way prohibits such a comparison.

he was told he needed to have had one year of treatment history and was sent away. (AR 383.) The limited nature of Dr. Gerson's treating relationship with Plaintiff entitled the ALJ to give her opinion less weight. See § 416.927(c); see also Orn, 495 F.3d at 631 (factors in assessing physician's opinion include length of treatment relationship, frequency of examination, and nature and extent of treatment relationship).

Given the limited number of meetings and the dearth of objective clinical findings underlying Dr. Gerson's medical opinion, including in her own treatment notes, the ALJ appropriately gave it "less weight." (AR 17.) See Thomas, 278 F.3d at 957; Connett, 340 F.3d at 875.

2.  Brief and conclusory

The ALJ noted that Dr. Gerson's opinion was "brief and conclusory in form." (AR 17); see also Thomas, 278 F.3d at 957 (citation omitted); accord Batson, 359 F.3d at 1195. Generally, medical-opinion evidence based on clinical findings is more persuasive than evidence based on subjective symptom testimony. See Thomas, 278 F.3d at 957.

Dr. Gerson's opinion (AR 410-15) and treatment notes (see, e.g., AR 392, 386, 384, 407, 424) consist of brief and largely repetitive conclusory statements supported primarily, although not exclusively, by Plaintiff's subjective symptom allegations. But the ALJ found (and Plaintiff does not contest) that his "allegations of disabling symptoms" were "inconsistent" with his "treatment history," his "reported daily activities," and the "objective evidence" and merited "less weight." (AR 15-16.) Indeed, Plaintiff provided inconsistent versions of his relevant

medical history and symptoms to various examining and treating physicians. For example, he told several practitioners that he had had auditory hallucinations (see, e.g., AR 365, 392) and suffered from alcoholism (see, e.g., AR 50, 370 ("substance abuse"), 392) but he denied to Dr. Ritvo in October 2013 that he had had any "delusions, hallucinations, morbid mood changes," or "psychosis" and denied having a history of excessive alcohol use (AR 304-05). He also denied to a substance-abuse counselor in August 2014 that he had had auditory or visual hallucinations. (AR 391.) Just five days before Dr. Gerson gave her opinion finding Plaintiff disabled in large part because of his hallucinations, he denied any such hallucinations "at this time" to a nurse practitioner. (AR 423.) Dr. Gerson's apparent failure to administer any objective diagnostic tests to support the severity of her opinion is particularly problematic in light of the ALJ's unchallenged discounting of Plaintiff's subjective symptom credibility.

For the Mental Impairment Questionnaire, Dr. Gerson filled out the checklist and provided brief, repetitive, and unsupported statements as explanation or no explanation at all. (See generally AR 411-15.) For example, she marked that Plaintiff had had one or two "[e]pisodes of decompensation within a 12 month period, each of at least two weeks duration," but no evidence exists in the record or in her notes of any episodes of decompensation during the relevant period. (See AR 414; see also AR 14 (ALJ noting that Plaintiff has "experienced no episodes of decompensation that have been of extended duration"), 417 (Dr. Simonian noting "no past history of psychiatric hospitalization

or treatment").) See Van Orsdol v. Colvin, 671 F. App'x 410, 410 (9th Cir. 2016) (physician's opinion properly discounted when it was "unexplained and unsupported by evidence"); see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (ALJ may reject opinions that consist "primarily of a standardized, check-the-box form"). Similarly, she ascribed Plaintiff's extreme limitations in large part to his alleged hallucinations, but she noted elsewhere that the hallucinations were exacerbated by his drinking (see, e.g., AR 386, 407), which, according to her, he had stopped (see AR 411, 415). And as noted, to the extent Dr. Gerson made clinical findings based on her own observations, they were largely benign: Plaintiff was "oriented x4" and "cooperative" and had "intact" "insight" and "judgement," "adequate" "impulse control," and "linear" "thought process." (AR 410.)

Because Dr. Gerson's opinion about Plaintiff's ability to work did not accord with the general medical record, including her own treatment notes (and appears to have relied primarily on Plaintiff's inconsistent and unreliable reporting of his symptoms), the ALJ did not err in giving it "less weight." Furthermore, the ALJ's finding that Plaintiff was not disabled was justified based on the record as a whole. See Robbins, 466 F.3d at 882; see also Reddick, 157 F.3d at 720-21.

**VI. CONCLUSION**

Consistent with the foregoing and under sentence four of 42

U.S.C. § 405(g),[21] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and in Defendant's favor.


DATED: October 11, 2018          _____
                                 JEAN ROSENBLUTH
                                 U.S. Magistrate Judge

---

[21] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."